The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Jan Pittman. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except with the modifications of the Award below and the addition of the Order.
* * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. On or about May 9, 1990 plaintiff's alleged date of injury, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The employer-employee relationship existed between plaintiff and defendant-employer, Eaton Corporation.
3. Plaintiff's average weekly wage on or about May 9, 1990 was $440.00.
4. Five pages of medical records from Park Ridge Hospital (Stipulated Exhibit 1).
5. Form 18 dated June 3, 1992 (Stipulated Exhibit 2).
6. Plaintiff's personnel file with defendant-employer (Stipulated Exhibit 3).
* * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. Plaintiff is a 63-year-old male with a high school degree who attended college for approximately two and one-half years. In addition to his employment with defendant-employer, plaintiff's employment history includes self-employment as a publisher of an antique automobile magazine, self-employment as an automobile importer/distributor, employment as a professional horse trainer, employment as a kiln operator and employment in various temporary positions.
2. Plaintiff began employment with defendant-employer as a temporary employee in November 1987. Throughout his employment with defendant-employer, plaintiff operated various machines, including an MTS machine, a back facer machine, and a parts washer. During his employment with defendant-employer, plaintiff worked the second shift.
3. On the afternoon of May 9, 1990, plaintiff reported for work at approximately 3:30 P.M. and was assigned to operate a MTS machine. The MTS machine to which plaintiff was assigned on this occasion was located approximately 25 to 35 feet from other employees who were working at a machine called the "green washer."
4. As the second shift work began, plaintiff's co-employees located at the "green washer" began applying a substance called rust-lick 631 on aluminum parts before the parts were to be run through the "green washer" to be cleaned. Rust-lick 631 is a petroleum-based aerosol lubricant and is commonly used by defendant-employer's employees on both parts and machines. Rust-lick is sprayed onto aluminum parts before the parts are placed in the "green washer" to be cleaned, to loosen up "slag" or excess casting material and other existing dirt or deposits.
5. Shortly after work began on the second shift on May 9, 1990 plaintiff was observed by his supervisor standing around and not operating the machine to which he had been assigned. Plaintiff refused to operate his assigned machine, contending that the rust-lick 631 being sprayed by his co-employees was drifting down to his work area and that inhalation of the rust-lick 631 vapors was dangerous to his health. Thereafter, although plaintiff's supervisor removed plaintiff from the area and temporarily assigned him to a different job in another department while he conducted an investigation, plaintiff began engaging other co-employees and telling them that they were in danger of toxic poisoning from the rust-lick 631.
6. Plaintiff's supervisor investigated plaintiff's complaints and it was determined that no detectable mist or over-spray from the rust-lick 631 was making its way to plaintiff's work area and there was only a slight odor from the rust-lick 631 that was noticeable from where plaintiff was assigned to work. In addition, plaintiff's supervisor checked the vent closest to plaintiff's work station and determined that the vent was not blowing any mist or over-spray in the direction of plaintiff's work area. A co-employee working along side of plaintiff at the time did not notice any odor.
7. Defendant-employer's employees have used rust-lick 631 for lubricating purposes for a number of years with no reported complaints or adverse reactions thereto. The threshold limit for exposure to rust-lick 631 is 220 PPM for an eight-hour working day. While over-exposure to rust-lick 631 by inhalation (at high temperatures) may lead to mild depression and/or a loss of consciousness, defendant-employer's plant is well ventilated. There was an exhaust vent located at the "green washer" where the rust-lick 631 was being sprayed. There is no evidence in this matter that defendant-employer's employees were being exposed to unacceptable amounts of rust-lick 631 on May 9, 1990. The spraying of rust-lick 631 by plaintiff's co-employees on May 9, 1990 did not constitute an unusual occurrence which interrupted plaintiff's normal work routine.
8. Following the investigation made by plaintiff's supervisor, although it was determined that plaintiff was not being exposed to unacceptable quantities of rust-lick 631, plaintiff was provided a paper mask and instructed to return to his work assignment at the MTS machine. However, instead of so doing, plaintiff requested to speak with the plant manager.
9. Plaintiff met with the plant manager and he was advised to return to his work assignment at the MTS machine or to leave work and not complete his shift that day. Plaintiff advised the plant manager that he was feeling ill and he was instructed to lie down in the first aid room. While in the first aid room plaintiff telephoned a local poison control center claiming he had been exposed to poisonous chemicals. He was instructed by the poison control center to be seen at the emergency room. The employer made arrangements for plaintiff to be taken to Park Ridge Hospital.
10. Plaintiff reported to the emergency room of Park Ridge Hospital on May 9, 1990 with complaints of headache, nausea and dizziness. However, it is noteworthy that when plaintiff reported to work on May 9, 1990, prior to his alleged exposure, plaintiff was complaining of experiencing a headache.
11. Due to his complaint plaintiff was authorized by the emergency room physician at Park Ridge Hospital to remain out of work for four days. Plaintiff was released to return to full employment as of May 14, 1990 without restrictions. Plaintiff's medical bills for his treatment at Park Ridge Hospital during this period of time were paid for by defendant-employer.
12. When plaintiff reported to work with defendant-employer on May 4, 1990, he was informed that his employment with defendant-employer had been terminated as a result of his insubordinate behavior and disruption of plant harmony. Prior to May 9, 1990 plaintiff had been counseled several times regarding his lack of cooperation with his supervisor and other co-workers. Plaintiff's employment with defendant-employer was terminated for reasons unrelated to his alleged injury.
13. After being released to return to full work duties on May 14, 1990, plaintiff continued complaining of frequent headaches, shortness of breath and mild swelling or raspiness of his throat. On May 29, 1990 plaintiff came under the care and treatment of Dr. Possiager, an internist, for complaints of shortness of breath, headaches and dizziness. Examination of plaintiff on May 29, 1990 was unremarkable except for mucosal swelling of the right nostril and slight throat irritation. Diagnoses were: hypertension, essential; hypercholesterolemia; headaches; adult situational reaction; and shortness of breath after exposure to petroleum. The diagnosis of shortness of breath due to petroleum exposure was based solely on the history related to Dr. Possiager by plaintiff as Dr. Possiager was unable to medically attribute plaintiff's complaints of shortness of breath to any chemical exposure. In Dr. Possiager's opinion the blood gas studies performed on plaintiff on May 9, 1990 did not indicate any significant abnormality which would establish a relationship between plaintiff's shortness of breath and his alleged chemical exposure. As was the case with Dr. Possiager, the diagnosis attributing plaintiff's shortness of breath to chemical exposure which was made during his treatment at Pardee Hospital was based on plaintiff's allegation of exposure to a poisonous substance which is not deemed credible in light of the other evidence of record which fails to support plaintiff's claim of exposure to unacceptable amounts of rust-lick 631 or any other reason for plaintiff's subjective complaints.
14. When reseen on June 6, 1990 plaintiff was continuing to complain of dizziness associated with nausea. Therefore, Dr. Possiager referred plaintiff for further testing including a Schilling test which resulted in a diagnosis of plaintiff's condition as pernicious anemia, the condition which plaintiff is claiming resulted from his alleged exposure to rust-lick 631 on May 9, 1990.
15. Pernicious anemia results from an impairment of the intrinsic factor which affects the body's ability to absorb B-12. The body's capacity to store B-12 is significant and the body's inability to absorb B-12 does not occur immediately but gradually over a period of time. There does not exist a casual relationship between exposure to the chemicals contained in the substance rust-lick 631 and the development of pernicious anemia.
16. Plaintiff's condition of pernicious anemia pre-existed his alleged work-related exposure to rust-lick 631 on May 9, 1990.
17. Pernicious anemia is an ordinary disease of life to which the general public is equally exposed. Plaintiff has failed to prove that his pre-existing condition of pernicious anemia was significantly aggravated by or accelerated by causes and conditions characteristic of and peculiar to his employment with defendant-employer, specifically the spraying of rust-lick 631 on May 9, 1990.
18. Plaintiff has also failed to prove that his pre-existing condition of pernicious anemia was aggravated by, accelerated by or exacerbated by any exposure to the substance rust-lick 631 on May 9, 1990 so as to constitute an interruption of plaintiff's regular work routine.
* * * * * * * * * * *
The foregoing findings of fact and conclusions of law engender the following additional
CONCLUSIONS OF LAW
1. Plaintiff has not shown that his condition of pernicious anemia is a disease or condition that is due to causes and conditions which are characteristic of and peculiar to his employment with defendant-employer, but excluding all ordinary diseases of life to which the general public is equally exposed outside of said employment nor has plaintiff shown that he suffers from a condition which is listed as a designated occupational disease in N.C.G.S. § 97-53. Therefore, plaintiff has failed to prove that his employment with defendant-employer was a significant contributing or causative factor in the development of an occupational disease. N.C.G.S. § 97-53 (9), (12), and (13);Booker v. Duke Medical Center, 297 N.C. 458 (1979).
2. Plaintiff's condition of pernicious anemia did not result from an injury by accident arising out of and in the course of his employment with defendant-employer. N.C.G.S. § 97-2 (6).
3. Plaintiff has failed to prove entitlement to any benefits pursuant to the provisions of the North Carolina Workers' Compensation Act. N.C.G.S. § 97-2 et seq.
* * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
AWARD
1. This claim must under the law must be and is hereby DENIED.
2. Each side shall pay its own costs.
* * * * * * * * * * *
Upon review of the motions filed herein, the Full Commission enter the following
ORDER
1. Plaintiff's motion for trial de novo and/or remand is DENIED.
2. Defendant's motion to compel plaintiff to show good cause is DENIED.
FOR THE FULL COMMISSION
 S/ ________________ COY M. VANCE COMMISSIONER
CONCURRING:
S/ ___________________ BERNADINE S. BALLANCE COMMISSIONER
S/ ________________ J. HOWARD BUNN, JR. CHAIRMAN
CMV/cnp/mj 7/28/95